NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260349-U

NO. 4-26-0349

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.K., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 23JA62 |
| v. | ) | |
| Joshua K., | ) | Honorable |
| Respondent-Appellant). | ) | Erin B. Buhl, |
| | ) | Judge Presiding. |

---

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The appellate court granted appointed counsel's motion to withdraw and affirmed the order terminating respondent-father's parental rights where there was no nonfrivolous basis to challenge the trial court's judgment.

¶ 2  Respondent, Joshua K., appeals an order terminating his parental rights to his son, K.K. Respondent's appointed counsel has moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), upon concluding that there is no nonfrivolous issue to raise on respondent's behalf. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (explaining the procedure to move to withdraw pursuant to *Anders* in a case involving termination of parental rights). Respondent did not file a response to the motion. For the following reasons, we grant counsel's motion and affirm the trial court's judgment.

¶ 3  I. BACKGROUND

¶ 4  On March 1, 2023, the State filed a three-count petition with respect to K.K.,

alleging that (1) his environment was injurious to his welfare in that respondent "strikes the minor leaving cuts, welts and/or bruises, thereby placing the minor at risk of harm" (705 ILCS 405/2-3(1)(b) (West 2022)) (count I); (2) he is an abused minor in that respondent "creates a substantial risk of physical injury to such minor other than by accidental means, which would likely cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function," in that respondent "bit the minor's finger, strangled the minor, and struck the minor with a belt and a shoe leaving marks and bruises on the minor's body" (705 ILCS 405/2-3(2)(ii) (West 2022)) (count II); and (3) he is an abused minor in that respondent "inflicts excessive corporal punishment" in that respondent "bit the minor's finger, strangled the minor, and struck the minor with a belt and a shoe leaving marks and bruises on the minor's body" (705 ILCS 405/203(2)(v) (West 2022)) (count III). K.K. was eight years old when the petition was filed.

¶ 5        Along with the petition, the State filed an interview report from an Illinois Department of Children and Family Services (DCFS) investigator who interviewed K.K., his teachers, his school principal, and school staff. K.K. reported that respondent bit his finger, dragged him, hit him with a belt, and struck him in the forehead with a shoe. K.K.'s classroom teacher reported that K.K. has autism but is "highly functioning." She reported that K.K. missed school for a few days and then came back with healed injuries. She never confronted respondent because he "is a scary man," who yells and curses at school staff. The principal reported that respondent " 'is crazy.' " He yells and curses, calling staff " 'bitches.' " The principal reported that "[s]chool staff are afraid of him and what he's capable of doing to them and [his] child." A member of the school staff reported that K.K. "comes in all the time with bruises on his body and thighs." She also stated that he missed school and then came back with what appeared to be healed injuries. K.K.'s occupational teacher reported that K.K. came to school wearing a short-sleeved shirt and

had marks all over his arms. When the teacher asked K.K. what happened, he said respondent hit him and that he could not come to school until the marks healed. She also saw bite marks and scabbing on his finger.

¶ 6　　　　K.K. was seen by a medical provider, who reported that K.K.'s injuries were "consistent with physical abuse." When the provider asked K.K. about marks on his neck, K.K. said, " '[D]ad holding neck and hard to breathe.' " When asked about a mark on his forehead, K.K. said, " '[D]ad hit me with a shoe.' " When asked about marks on his back, he responded, " '[D]ad dragged me, I hope he doesn't do it again.' "

¶ 7　　　　Respondent told the investigator that K.K. is "rough on himself" and denied harming him. K.K. lived only with respondent, who described himself as a "stay [at] home dad." Based on the investigator's report, DCFS felt there was an urgent and immediate need to remove the minor from respondent and placed him with a relative.

¶ 8　　　　On March 2, 2023, respondent appeared before the trial court and was appointed counsel. He waived his right to a shelter care hearing. The court found the existence of probable cause, that there was an urgent and immediate necessity to remove K.K. from the home, and that reasonable efforts by DCFS could not be made to allow K.K. to remain at home.

¶ 9　　　　The trial court held an adjudicatory hearing on July 19, 2023. At that time, respondent stipulated that K.K. was a neglected minor as set forth in count I of the petition. Counts II and III were dismissed. The court held a dispositional hearing immediately thereafter and ultimately made K.K. a ward of the court. The court ordered respondent to cooperate with DCFS and its contracting agencies and participate in drug, alcohol, and psychological treatment.

¶ 10　　　　On March 31, 2025, the State filed a motion to terminate respondent's parental rights, alleging that he was unfit in that he (1) failed to maintain a reasonable degree of interest,

concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to make reasonable efforts to correct the conditions that caused the child to be removed during the nine-month periods of "03/25/2024 to 12/25/24 and/or 06/24/24 to 03/24/2025" (750 ILCS 50/1(D)(m)(i) (West 2024)); (3) failed to make reasonable progress toward the return of the child during the nine-month periods of "03/25/2024 to 12/25/2024 and/or 06/24/2024 to 03/24/2025" (750 ILCS 50/1(D)(m)(ii) (West 2024)); and (4) is depraved (750 ILCS 50/1(D)(i) (West 2024)).

¶ 11                                   A. Unfitness Hearing

¶ 12          The trial court held the unfitness hearing in October and December 2025. At the hearing, the State admitted into evidence certificates of conviction for respondent, showing that on January 14, 2025, he was convicted of three counts of aggravated battery of a child under 13 years of age, a Class 3 felony (720 ILCS 5/12-3.05(b)(2) (West 2024)) and one count of domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(1) (West 2024)). Additionally, the State provided certificates of conviction showing that on August 29, 2013, respondent was convicted of one count of domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(1) (West 2012)) and one count of harassing a witness or family member, a Class 2 felony (720 ILCS 5/32-4a(a)(2) (West 2012)).

¶ 13          Catharine Patenaude testified that she was employed by the Youth Service Bureau, Illinois Valley, as a foster care caseworker and had been K.K.'s caseworker since October 2023. She testified that the case came into care in the spring of 2023 based on "neglect and abuse allegations." She testified that respondent communicated with her inconsistently for six to seven months after she obtained the case but then stopped. She last talked to him in the fall of 2024. Respondent was ordered to complete services for domestic violence, substance abuse, parenting, and mental health. Respondent did not complete any of those services. Patenaude testified that respondent did not appear interested in K.K. or the services he was required to complete.

According to Patenaude, respondent's primary focus appeared to be on his criminal case. Respondent was entitled to weekly visitation with K.K. but did not regularly attend visits. Respondent last visited K.K. in the summer of 2024. Since Patenaude had been the caseworker for K.K., respondent had not provided K.K. with toys, gifts, or letters and did not inquire about K.K.'s health, safety, or welfare. When asked if the agency had concerns about respondent's ability to safely parent, Patenaude answered affirmatively, and when asked why, she explained:

> "Due to his lack of interest in his son, due to past history that brought the case open, and not correcting any of the conditions that brought [K.K.] into care, and what he's needed to change, also his continued criminal activity, and a lack of accountability for what he's been charged with and now convicted of. Yeah, we definitely have concerns about his parenting ability."

¶ 14 When Patenaude initially took over the case, respondent had been charged with crimes against K.K. Respondent was still allowed to visit K.K. with "mandated supervision by the agency." She only recalled respondent having one visit with K.K. Respondent told Patenaude that he did not participate in any services "on the advice of his criminal attorney."

¶ 15 Respondent testified that prior to this case, K.K. lived with him. According to respondent, K.K. has "high autistic spectrum functioning." Respondent testified that he was convicted of charges of abusing K.K. Respondent testified that he had a caseworker who wanted him to do a series of tasks, such as parenting classes, anger management classes, and drug drops. Respondent admitted that he did not complete any of those tasks before he was incarcerated because his criminal defense counsel advised him not to.

¶ 16 Respondent testified that he was taken into custody on May 19, 2025, after being found guilty in January 2025. During his incarceration, respondent has participated in "[n]umerous

classes." Those classes included a GED class, a domestic violence class, and an anger management class. Respondent testified that he received a notice that his visitation with K.K. was suspended "effective on 2/3/2025" because K.K. "has severe mental health needs, including [post-traumatic stress disorder] as a result of the abuse from his father." The notice further said that K.K. "expresses fear of his father, and visitation would be detrimental to his mental health."

¶ 17 Respondent testified that he last saw K.K. about eight months earlier at a visitation at a McDonald's in Carpentersville, Illinois. He said that occurred "during" the criminal trial. He also said he talked to K.K. every week on the phone through Zoom. He admitted he has had no visits with K.K. since he was convicted but said he requested them through the DCFS agency. He said he sent a letter and book to K.K. Respondent disagreed that visitation would be detrimental to K.K. because "he has no reason to fear [him]."

¶ 18 Patenaude was recalled to testify. She testified that the decision for K.K. not to visit respondent was made by her supervisor because of K.K.'s "consistent, regular statements that he is afraid of his father." According to Patenaude, K.K. said that he is happy his father is in prison because "that helps him not to worry." K.K. has worries because of "past abuse from his father." K.K. is currently the most stable he has ever been.

¶ 19 Patenaude denied that there was a visit between K.K. and respondent at McDonald's eight months earlier. She said K.K.'s last visit with his father in person was in approximately the summer of 2023, but then said she remembered one visit between K.K. and respondent sometime after October 2023. She agreed that during the time she has been the caseworker, respondent "has been not too involved in [K.K.'s] case."

¶ 20 B. Unfitness Determination

¶ 21 The trial court issued its unfitness determination on January 16, 2026. The court

found respondent unfit by clear and convincing evidence as to all four counts in the motion for termination of parental rights. The court stated that it was "uncontested that [respondent] refused to attend any assessment or service." The court found that respondent "has taken zero accountability or responsibility regarding his son." The court noted that from May 2025 to December 2025, respondent attended some classes "in sessions via his tablet." The court found respondent's efforts "insincere and minimal, at best—[respondent's] refusal to engage in assessments or services, his refusal to correct the conditions that caused [K.K.] to be removed, *** demonstrates no reasonable efforts or progress towards return home in either of the time periods alleged." The court also found "no demonstrable steps in services or visits towards return home," which "shows his lack of interest, concern, and responsibility as to [K.K.'s] welfare."

¶ 22    The trial court noted that while respondent was currently serving a six-year prison sentence, he was out of custody from January 2025, when he was found guilty, until May 2025. According to the court, respondent could have engaged in services and demonstrated remorse and compassion toward his son but "has simply chosen not to."

¶ 23    Finally, the trial court found a rebuttable presumption of depravity based on respondent's convictions. The court noted that respondent recently "began attending services on his tablet." However, the court found "this insufficient to rebut the presumption, given the short period of time he has engaged in general services and the setting; that is, a secure and controlled prison." According to the court, respondent "has not demonstrated or presented any evidence that he is able to conform to our community standards of morality, given the severity of abuse he inflicted on his special needs son." The court also noted respondent "expressed no remorse or accountability for this behavior." Thus, the court found the State had established depravity by clear and convincing evidence.

¶ 24                     C. Best Interests Hearing and Determination

¶ 25        The trial court held the best interests hearing on March 24, 2026. Patenaude testified that K.K. was 11 years old at the time of the hearing and lived with his aunt in Rockford, Illinois. According to Patenaude, K.K. had "high-functioning autism" and communicated "on a high level." K.K. had been living with his aunt since December 2024. According to Patenaude, K.K. used the word "love" for the first time shortly after he began living with his aunt. K.K. listens to her, respects her, and works with her. K.K. wants to live with her and asked Patenaude regularly if he was going to live with her. Every time Patenaude saw K.K., he asked if his father was in prison. When Patenaude said, "[Y]es," K.K. responded, " 'Good.' " According to Patenaude, K.K. does not miss his father. She said "he continues to be very upset with what he recollects from his history with his father." K.K. looked to his aunt for love and safety, and she provided for all his needs, including taking him to appointments related to his autism. K.K. also had a relationship with his maternal grandmother and sees her "regularly." Patenaude testified that K.K.'s placement with his aunt was stable, which is important for all children but especially for K.K. He needs stability, consistency, and a regular routine he can count on. According to Patenaude, K.K. is "flourishing" in his current placement, and his aunt wants to adopt him. Patenaude testified that it was in the best interests of K.K. for respondent's parental rights to be terminated. Patenaude explained that K.K. had come very far and "has a very high quality of life right now."

¶ 26        K.K. did not have visitation with his father because the agency decided that the visits were "not appropriate." According to Patenaude, respondent sent K.K. a book but no other gifts.

¶ 27        Respondent testified that he last saw K.K. in person outside of court at a McDonald's in Carpentersville. He thought the visit "went pretty well." When it was time to go,

K.K. told respondent he loved him. Respondent believed K.K. would want to visit him because K.K. loves him and has not seen him in a long time. Respondent said visitation with K.K. stopped a long time ago, probably in 2024. He said he had visits on Zoom with K.K. before the criminal trial. Respondent said he believed and hoped that K.K. wanted to see him. With good time credit, respondent believed he could be out of prison in a little over a year. Until then, he said, K.K. could remain with his aunt. Respondent testified that he loves K.K. and would like to have visits with him so he could see him and tell him that.

¶ 28    The trial court ruled that "every single best interest factor favors the termination" of respondent's parental rights and found the State had met its burden. The court found it was in K.K.'s best interests and consistent with his needs for respondent's parental rights to be terminated. Thus, the court entered an order terminating respondent's parental rights and appointing as K.K.'s guardian the guardianship administrator of DCFS, with the power to consent to adoption.

¶ 29    This appeal followed.

¶ 30                                II. ANALYSIS

¶ 31    In moving to withdraw, respondent's counsel identifies two potential issues for appeal: (1) whether the trial court's unfitness finding was against the manifest weight of the evidence and (2) whether the court's best interests finding was against the manifest weight of the evidence. Counsel explains why any challenges to the judgment lack arguable merit. We agree with counsel's assessment and have identified no other nonfrivolous issues that could be raised on appeal. Accordingly, we grant counsel's motion to withdraw and affirm the judgment terminating respondent's parental rights.

¶ 32    The involuntary termination of parental rights is a two-step process. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27. The State must first prove by clear and convincing evidence that

the parent is "unfit" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *D.D.*, 2022 IL App (4th) 220257, ¶ 27. If the trial court determines the parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor to terminate parental rights. *D.D.*, 2022 IL App (4th) 220257, ¶ 27. We will not disturb the finding of unfitness or the best interests determination unless the court's rulings are against the manifest weight of the evidence. *D.D.*, 2022 IL App (4th) 220257, ¶ 28. A court's decision is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." *D.D.*, 2022 IL App (4th) 220257, ¶ 28.

¶ 33                                    A. Unfitness Finding

¶ 34            The trial court found that respondent was an unfit parent because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to make reasonable efforts to correct the conditions that caused the child to be removed during the nine-month periods of "03/25/2024 to 12/25/24 and/or 06/24/24 to 03/24/2025" (750 ILCS 50/1(D)(m)(i) (West 2024)); (3) failed to make reasonable progress toward the return of the child during the nine-month periods of "03/25/2024 to 12/25/2024 and/or 06/24/2024 to 03/24/2025" (750 ILCS 50/1(D)(m)(ii) (West 2024)); and (4) is depraved (750 ILCS 50/1(D)(i) (West 2024)). Respondent's appellate counsel submits that there is no nonfrivolous basis to challenge any of these grounds of unfitness. We may affirm the judgment if the evidence supports any ground on which the court found respondent unfit. See *In re J.H.*, 2020 IL App (4th) 200150, ¶ 74. Accordingly, we will address reasonable progress.

¶ 35            " 'Reasonable progress' is an objective standard." *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). It exists when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the

*near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). "The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 36        A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m)(ii) (West Supp. 1999)). A finding of unfitness is appropriate if "the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 37        The trial court's finding of unfitness in this case was not against the manifest weight of the evidence. K.K. came into care in March 2023. In July 2023, respondent admitted to count I of the neglect petition, which alleged that K.K.'s environment was injurious to his welfare in that respondent "strikes the minor leaving cuts, welts and/or bruises, thereby placing the minor at risk of harm." Respondent was ordered to engage in services to correct the conditions that led to K.K. being taken into care, including services for domestic violence, substance abuse, parenting, and mental health. Respondent admitted that he did not complete any of those services during the two nine-month periods alleged in the motion to terminate parental rights: March 25, 2024, to December 25, 2024, and June 24, 2024, to March 24, 2025. Respondent also failed to take responsibility for his actions and made no attempt to correct the conditions that led to K.K. being taken into care. It was not until after respondent went to prison in May 2025 that he began taking classes to attempt to better himself. However, by then it was too late, since the two nine-month

periods alleged in the motion to terminate parental rights had already elapsed. Courts cannot consider evidence outside of the relevant nine-month periods at issue in the State's motion to terminate parental rights pursuant to section 1(D)(m). *In re J.L.*, 236 Ill. 2d 329, 341 (2010). Because respondent did not engage in any services during the periods alleged in the motion to terminate parental rights, he plainly did not make objectively reasonable progress toward the return of K.K. to his care. Thus, there is no nonfrivolous basis to challenge the unfitness finding.

¶ 38                                B. Best Interests

¶ 39          After a trial court makes a finding of parental unfitness, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Section 1-3(4.05) of the Juvenile Court Act of 1987 provides that "[w]henever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:"

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
>> (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
>>
>> (ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 40    Respondent's appellate counsel determined that there was no nonfrivolous basis to challenge the trial court's finding that terminating respondent's parental rights was in the best interests of K.K. We agree. The evidence showed that K.K. had been in care for three years and had lived with his aunt for over a year at the time of the best interests hearing. K.K. is bonded with his aunt, and she provides the stability he needs. His aunt is willing to adopt him and provide him with permanence. Respondent, on the other hand, is serving a prison sentence for abusing K.K. and had over a year left to serve at the time of the best interests hearing. He indicated that K.K. could come live with him after he finished his sentence and obtained a job. However, the evidence

showed that K.K. was afraid of respondent and had no desire to see him, let alone live with him. Additionally, the agency believed that even visiting respondent would be detrimental to K.K.'s mental health. As the court found, "every single best interest factor" favored terminating respondent's parental rights. Under the circumstances, there is no nonfrivolous basis to challenge the court's best interests finding.

¶ 41                                    III. CONCLUSION

¶ 42            For the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 43            Affirmed.